**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Shawn Michael Olthoff,

Plaintiff,

v.

Jason Warnygora, acting in his individual capacity as a Carlton County Deputy; Carlton County; the City of Moose Lake, as a member of the Carlton County area Consolidated Emergency Response Team (CERT); and the City of Cloquet, as a member of the Carlton County area CERT,

Defendants.

Case No. ________________

**COMPLAINT**

JURY TRIAL DEMANDED UNDER FED. R. CIV. P. 38(b)

---

For his Complaint, Plaintiff Shawn Michael Olthoff ("Olthoff") hereby states and alleges as follows:

1. This is an action for money damages and nonmonetary relief, in the form of discipline and training, for injuries sustained by Olthoff as a result of the unauthorized and improper use of deadly force and violation of his well-settled federal civil rights by Defendant Jason Warnygora ("Warnygora").

2. This cause of action arises purely out of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution. State law claims and, by consequence, the limitations and defenses under state law are not applicable to this civil-rights lawsuit.

3. Olthoff was, at all times material herein, a citizen of the United States and a resident of the State of Minnesota.

4. Upon information and belief, Defendant Warnygora was, at all times material herein, a duly appointed and acting deputy of the Carlton County Sheriff's Office. He is sued in his individual capacity for misconduct occurring under color of state law.

5. Defendant Carlton County is a "public corporation," suable under Minn. Stat. § 373.01, subd. 1(a)(1). Carlton County is, and at all times material herein was, a political entity charged with control and supervision of all deputies of the Carlton County Sheriff's Office.

6. Defendant City of Moose Lake is a municipality duly incorporated under the laws of the State of Minnesota and is a party to the Carlton County area Consolidated Emergency Response Team ("CERT").

7. Defendant City of Cloquet is a municipality duly incorporated under the laws of the State of Minnesota and is a party to the Carlton County area Consolidated Emergency Response Team.

8. Both Moose Lake and Cloquet are cities within Carlton County.

9. Olthoff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3). The aforementioned statutory and constitutional provisions confer original jurisdiction of this Court over this matter.

**EVENTS OF JULY 27, 2019**

10. At approximately 9:20 pm on July 27, 2019, Carlton County Sheriff Deputy Justin Jokinen was on duty and running what he describes as "routine registration checks" at the Kwik Trip off Highway 210 in Carlton, Minnesota.

11. Jokinen claims that a vehicle caught his eye and claims he believed the occupants were attempting to "evade his attention," so he ran the plate.

12. The subject vehicle was registered to Olthoff's mother (the "Olthoff vehicle.")

13. Jokinen had previously arrested Olthoff.

14. Jokinen began following the Olthoff vehicle as it traveled east on Hwy 210.

15. Jokinen planned to conduct an investigative stop of the Olthoff vehicle.

16. While he was following the Olthoff vehicle, Jokinen reportedly observed the passenger side wheels of the Olthoff vehicle cross over the fog line, an often-used pretextual basis for a stop.

17. There is no squad video to confirm Jokinen's above-listed claim.

18. In response, Jokinen activated his emergency lights to conduct a traffic stop and the Olthoff vehicle began slowing to pull over on the right hand shoulder of Highway 210.

19. Jokinen reported that, prior to the Olthoff vehicle coming to a complete stop, a male exited the vehicle.

20. Jokinen "observed the male point what I believed to be a handgun at me."

21. Jokinen took evasive action with his squad.

22. Additional Carlton County personnel responded to the incident, as well as officers from the Cloquet Police Department, the Fond du Lac Police Department, the Minnesota Department of Natural Resources, Minnesota State Patrol and the Minnesota Border Patrol, to assist Jokinen.

23. Upon the arrival of backup to the scene, Jokinen learned the male had fled on foot.

24. Jokinen believed the male that exited the vehicle to be Olthoff, which was confirmed by the remaining vehicle occupants.

25. The driver of the Olthoff vehicle was a female and there was one remaining passenger, a minor child. These two occupants informed law enforcement that Olthoff had run south into the woods.

26. A search of the area was conducted.

27. Olthoff was not found.

28. Nor was any firearm.

29. A holster containing 9 millimeter ammunition and Olthoff's cell phone were located.

**OLTHOFF'S MOTHER SEEKS TO DELIVER HER SON SAFELY TO LAW ENFORCEMENT AND LAW ENFORCEMENT OVERREACTS**

30. On July 29, 2019, Carlton County Investigator Dan Danielson spoke with Lauri Ketola of the County Attorney's Office and they made Olthoff "a priority for the day."

31. Carlton County Investigator Russell French assisted Jokinen in drafting search warrants for the Olthoff vehicle, the cellphone and a DNA sample from Olthoff.

32. According to the summary later prepared by the Minnesota Bureau of Criminal Apprehension ("BCA"), which was the agency called in to investigate the July 29 officer-involved shooting, "Inv. French was involved with this fluid criminal investigation

with Chief Deputy Belich, Inv. Danielson, Inv. Bastien and Deputy Jokinen, with assistance from the Carlton County Attorney's office."

33. Many additional law enforcement officers would zealously volunteer to assist in the apprehension of Olthoff as the day progressed, even though Olthoff's mother would inform them of his exact whereabouts, confirm he was sleeping and confirm he was unarmed.

34. At approximately 12:35 p.m. on July 29, Olthoff's mother called to inquire about her vehicle, which had been towed from the scene of the July 27 incident described above and was now the subject of the search warrants drafted by French and Jokinen.

35. At approximately 12:45 p.m., the search warrant for the Olthoff vehicle was executed and drug paraphernalia was found.

36. At approximately 1:30 p.m. on July 29, Danielson again spoke with Olthoff's mother. This time she reported her son was at her home – a trailer located at 23 Hillside Terrace, Moose Lake, Minnesota.

37. Danielson noted that each time he talked to Olthoff's mother on July 29 he was informed that Olthoff was not armed and there were no weapons in the home.

38. Danielson, having obtained Olthoff's whereabouts, set in motion plans to take him into custody.

39. According to French, after the second call from Olthoff's mother, the investigation started to speed up. At this stage, he removed himself from the investigative role he had assumed earlier that day, transitioning to prepare for a tactical response.

40. Multiple other law-enforcement officers, from multiple other agencies, were contacted and informed of Olthoff's location.

41. At approximately 2:00 p.m., a CERT team call out was sent via text message. The text message from CERT Team Notification read:

> CERT Team Members up north report to ERT BLDG. CERT Team Members down south report to MLPD. Suspect in firearms incident believed to be at a residence in Moose Lake. Reply with YES to confirm receipt.

42. The CERT team is the Consolidated Emergency Response Team consisting of law enforcement officers from the Carlton County Sheriff's Office, the Cloquet Police Department and the Moose Lake Police Department.

43. The prospective members of the CERT team apply for positions on the team.

44. Once the prospective members are accepted to the CERT team, they undergo specialized training and testing.

45. The CERT team trains on a monthly basis.

46. The purpose of the CERT team is to respond to high-risk arrests, criminal activity, detentions and hostage situations.

47. Other agencies are called to assist the CERT team on a mutual-aid basis, such as dispatchers, tactical paramedics and K9 handlers.

48. As noted in the text, the northern area CERT team members were to gather at the ERT building, which is at or near that Carlton County Courthouse. After the northern members had gathered there, they then were to head the Moose Lake Police Department (MLPD) to meet with the southern area CERT team members who had been instructed to gather there via the call out.

49. Many officers responded in the affirmative to the call out, signaling that they elected to assist.

50. Defendant Warnygora responded "YES" to the CERT team call out at approximately 2:06 p.m.

51. On July 29, 2019, prior to the CERT call out, Warnygora was given a heads up that CERT would be called in.

52. On July 29, 2019, prior to the CERT call out, Warnygora had left his location which was reportedly an "hour out."

53. On July 29, 2019, prior to the CERT call out, Warnygora expressed dissatisfaction that the CERT team had not been activated for Olthoff.

54. On July 29, 2019, prior to the CERT call out, Warnygora consumed alcohol.

## THE PLAN FOR THE APPREHENSION OF OLTHOFF

55. The main CERT briefing was held at the MLPD after the arrival of the northern and southern members of the team.

56. Nine CERT Team members attended the July 29 briefing at MLPD, including:

- Defendant Warnygora;
- Carlton County deputy Russell French;
- Carlton Count Sergeant Douglas Rotta;
- Carlton County deputy Joe Mattinen;
- Carlton County deputy Randy Roberts;
- Cloquet police officer Nate Cook;
- Cloquet police officer Darrin Berg;

- Cloquet police officer Larry Sherk;
- Cloquet police officer Kyle Volzke;

57. Additional personnel, including personnel called in for assistance on the mutual-aid basis, also attended the briefing at MLPD, including:

- Pine County Deputy Benjamin Neel;
- Michael Blankenship (non-police officer CERT team negotiator);
- Peter Erickson (CERT paramedic);
- Chad Vermeersh (CERT paramedic);
- Carlton County Investigator Danielson;
- Carlton County deputy Frederick Petite;
- Carlton County deputy Louis Dahlen;
- Carlton County deputy Bridget Johnson;
- Carlton County deputy Justin Frykman;
- Cloquet police officer Zachary Sandstrom;
- Minnesota State Patrol trooper Michael Hagen;
- Minnesota Department of Natural Resources officer Brent Speldrich;
- Minnesota Department of Natural Resources officer Scott Staples;
- MLPD Chief Bryce Bogenholm;
- MLPD Sergeant Michael McNulty; and
- Deputy US Marshal Brandon Belich.

58. The "ops plan" was written on the white board in the MLPD fire department training room and is depicted below:




59. No written documentation of the plan was provided to those in attendance at the briefing.

60. The sketch of the trailer where Olthoff was sleeping was inaccurate.

61. The photograph of the trailer shown at the briefing depicted a yellow trailer when, in fact, the trailer was blue.

62. The other details of the plan were verbally communicated to those in attendance and included very little by way of contingency planning other than who would be located on the perimeter in the event that Olthoff fled.

63. The information from the whiteboard and the information communicated verbally at the briefing focused on Jokinen's reported, but unverified, claim that Olthoff had possessed a firearm on July 27.

64. From the BCA file, it is apparent that zero regard was given to the information Danielson repeatedly obtained from Olthoff's mother on July 29: that Olthoff had **no** weapons.

65. Some of the law enforcement officers' assignments were included on the "ops plan" – i.e, Team 1 and Team 2 – while others verbally assigned.

66. According to the BCA file, Carlton County Investigator Anthony Bastien was sent to preform pre-surveillance.

67. Carlton County Investigator Bastien did not attend the briefing.

68. According to the BCA file, Carlton County deputy Jokinen conducted pre-surveillance.

69. Carlton County deputy Jokinen did not attend the briefing.

70. According to the BCA file, Carlton County deputy Roberts was sent to perform pre-surveillance, but he attended the briefing.

71. CERT Team 1 was the entry team.

72. CERT Team 1 consisted of Defendant Warnygora, Cook, Berg and French.

73. Defendant Warnygora was the team lead for Team 1.

74. Cook was responsible for deploying a flash-bang grenade.

75. French was responsible for the ballistics shield.

76. Berg was to carry the ram and check the door.

77. The order of the CERT Team 1 stack was to be: 1) French; 2) Berg; 3) Cook and 4) Warnygora.

78. CERT Team 2 was the inner-perimeter team.

79. CERT Team 2 consisted of Sherk, Voltzke, Neel, Rotta and Brandon Belich.

80. The following personnel were assigned outer-perimeter positions: Petite, Frykman, Hagen, Dahlen, Johnson, Sandstrom, Bogenholm, and Staples.

81. MLPD officer Jamie Jungers missed the briefing, but was assigned to the outer perimeter.

82. McNulty was assigned the role of standby.

83. Brent Speldrich was to transport CERT Team 1 and provide support for the medical team.

84. Both Mattinen and Carlton County Chief Deputy Brian Belich were to stay at the MLPD.

85. Danielson was to call Olthoff's mother once the CERT Teams and perimeter personnel were in place so that she could exit the trailer with her dog. She and the dog were to be taken away from the scene by Danielson as CERT Team 1 made entry into her residence.

86. At the briefing at MLPD, French learned that the Carlton County Attorney's Office had drafted an application for an arrest warrant for Olthoff stemming from the July 27 incident. French signed the application.

87. Shortly thereafter, it was learned that a Carlton County District Court Judge signed the application authorizing the arrest warrant for Olthoff.

88. The personnel remaining at the MLPD departed the MLPD at approximately 3:30 p.m. and arrived on scene.

89. Additional personnel who were not included in the "ops plan" also eventually arrived to the Olthoff trailer. This included individuals that self-assigned and failed to attend the briefing, such as Minnesota Department of Natural Resource officer Dustin Speldrich – whose husband, Brent Speldrich, told her about the operation – and Minnesota State Patrol trooper Erick Sjodin.

## THE ARRIVAL AND ENTRY

90. According to Danielson, French, Berg and Cook, Olthoff's mother came out of her residence "as planned" and Danielson "[g]uided her into [his] squad…and evacuated her."

91. According to Cook, as Olthoff's mother was heading to Danielson's vehicle, she passed CERT Team 1 and they asked her if Olthoff was still sleeping.

92. This was important to CERT Team 1 because, if Olthoff remained sleeping, they would use the flash-bang grenade.

93. Otlhoff's mother informed CERT Team 1 that her son was still sleeping on the couch and that the door was unlocked and open.

94. Warnygora radioed that Olthoff was still sleeping.

95. In response to the information about the open door, Berg laid down his ram. It was no longer needed.

96. Shortly after Olthoff's mother was taken care of by Danielson, CERT Team 1 made its approach on the trailer.

97. CERT Team 1 found that the construction of the trailer was different than described in the briefing and ops plan. The porch was not open air, but instead was completely enclosed. Further, the porch had less square footage.

98. CERT Team 1 also discovered that the location of the couch was different than described in the briefing and ops plan - it was on the wall to the right of the main entrance and not directly in front of the door.

99. As CERT Team 1 entered the small porch, the stack order became jumbled.

100. Upon seeing Olthoff sleeping, Berg had initially thought it was the "perfect opportunity … I'm just gonna get on him and just go get him."

101. But, the flash-bang grenade's use inside the trailer was still the plan because it had been confirmed Olthoff was sleeping.

102. There was some confusion on the porch about who should be where when the flash-bang grenade was deployed. Cook had to get Berg's attention so he could move out of the way.

103. Cook then threw the flash-bang grenade.

104. The flash-bang grenade had the intended effect on Olthoff.

105. Berg, Cook and Warnygora were inside the trailer.

106. French was left outside the threshold of the door due to the congestion, even though the plan was for him to be the first to enter.

107. Cook had his rifle out and pointed at Olthoff.

108. Cook commanded Olthoff to show his hands.

109. In response, Olthoff immediately complied and lifted up both hands.

110. Olthoff's hands were empty.

111. Olthoff had no weapon.

112. Olthoff was lying on the couch with both empty hands up near his ears, with his right armpit exposed.

113. At that moment, Olthoff was shot by Warnygora.

114. Then, he was shot *again* by Warnygora.

115. These actions left the rest of his CERT team confused and shocked. They wondered what they had missed because they did not see a gun, they did not see anything but an unarmed individual lying with his hands up – as he had been commanded to do by law enforcement.

116. On July 29, 2019 – the date of the incident – Cook described the shooting of Olthoff to the BCA, stating: "I have my rifle pointed at him or right below him and I yell let me see your hands, he lifts his hands up and then I hear two gunshots."

117. Further, when asked by the BCA "when you said show me your hands, where did his hands go[,]" he stated "by his face…by his ears."

118. Similarly, on the date of the incident, Berg – the 22-year veteran – described the shooting of Olthoff to the BCA as follows:

> I start moving and, and at that point I see Jason come in you know in the, my peripheral vision, I could see him come in and I see the guy on the couch and he's got his hands up and he's uh he's just laying on the couch with his hands up like this, well you know obviously we're on tape but he had his hands up and uh I hear bang and I see you know uh, so as he's laying on the couch I see, I heard the bang and I see blood just you know probably about two inches dia, you know size of a, a, you know a half dollar at that point and then you know I thought well you know I was, I didn't know you know I, I did I miss something or, or you know because it was, I was kind of taken back by the, the whole thing because I didn't, I didn't see a, I didn't see nothing, I didn't see a gun, I didn't

> see anything. And uh, uh then I remember hearing a second shot, boom. So it was boom, boom. And they, I believe, I, I saw the one that hit it was right side of him and I believe the other one was you know close proximity.

119. Both Cook's and Berg's version matched that later described by Olthoff himself when he was medically able to provide a statement to the BCA about the events of July 29, 2019.

120. On September 10, 2019, Olthoff told the BCA that he "was laying on his left side" when he "heard a flash bang, boom and I heard let me see your hands and, and I rolled over and I put my hands in the air like that…my armpit was exposed. So I was like this and immediately they shot me twice."

**<u>EVENTS INVOLVING THE UNCONSTITUTIONAL USE OF DEADLY FORCE ON SHAWN MICHAEL OLTHOFF BY DEFENDANT JASON WARNYGORA</u>**

121. Warnygora fired his two shots at approximately 16:30 hours on July 29, 2019.

122. Warnygora fired those two shots from his Glock Model 23 GEN4 40 S&W caliber pistol bearing serial number SBN474 into Olthoff.

123. At the time of the shooting, Warnygora's firearm was functional and its trigger pull was measured and found to be from 6 to 6 ½ pounds.

124. Warnygora's gun fired the two 40 S&W caliber cartridges and the bullet recovered from Olthoff.

125. At the time Warnygora shot Olthoff, Olthoff's empty hands were observable to all three law enforcement officers in the room.

126. Paragraph 125 is entirely consistent with all the physical and forensic evidence, plus the BCA statements of three of the four occupants of the room in the trailer in which Olthoff was shot: Cloquet Police Detective Berg, Cloquet Police Officer Cook and Olthoff.

127. When Warnygora shot Olthoff, Olthoff was observably complying with the law enforcement commands to show his hands by raising his empty hands so they could be observed.

128. Paragraph 127 is entirely consistent with all the physical and forensic evidence, plus the BCA statements of three of the four occupants of the room in the trailer in which Olthoff was shot: Cloquet Police Detective Berg, Cloquet Police Officer Cook and Olthoff.

129. There was no firearm present in the trailer that was occupied by Olthoff when he was shot by Warnygora, other than those possessed by the law enforcement occupants.

130. Paragraph 129 is entirely consistent with all the physical and forensic evidence, plus the BCA statements of three of the four occupants of the room in the trailer in which Olthoff was shot: Cloquet Police Detective Berg, Cloquet Police Officer Cook and Olthoff.

131. Olthoff did not pose an imminent threat of serious bodily harm or death to any law enforcement officer present or anyone else when he was shot by Warnygora.

132. Paragraph 131 is entirely consistent with all the physical and forensic evidence, plus the BCA statements of three of the four occupants of the room in the trailer in which Olthoff was shot: Cloquet Police Detective Berg, Cloquet Police Officer Cook and Olthoff.

133. At the time Warnygora shot Olthoff, Olthoff was not attempting to resist arrest or evade arrest by flight given the circumstances.

134. Paragraph 133 is entirely consistent with all the physical and forensic evidence, plus the BCA statements of three of the four occupants of the room in the trailer in which Olthoff was shot: Cloquet Police Detective Berg, Cloquet Police Officer Cook and Olthoff.

135. At the time Warnygora shot Olthoff, Olthoff was the only subject to be controlled.

136. Paragraph 135 is entirely consistent with all the physical and forensic evidence, plus the BCA statements of three of the four occupants of the room in the trailer in which Olthoff was shot: Cloquet Police Detective Berg, Cloquet Police Officer Cook and Olthoff.

137. At the time Warnygora shot Olthoff, there were three law enforcement officers in the room; one armed with a rifle and two armed with pistols.

138. Paragraph 137 is entirely consistent with all the physical and forensic evidence, plus the BCA statements of all of the three law enforcement occupants of the room in the trailer in which Olthoff was shot: Cloquet Police Detective Berg, Cloquet Police Officer Cook and Olthoff.

139. Neither Cloquet Police Detective Berg nor Officer Cook chose to fire at Olthoff based on their observations of the events unfolding before them in the Olthoff trailer.

140. Paragraph 139 is entirely consistent with all the physical and forensic evidence, plus the BCA statements of three of the four occupants of the room in the trailer in which Olthoff was shot: Cloquet Police Detective Berg, Cloquet Police Officer Cook and Olthoff.

141. Detective Berg stated that before Warnygora fired his two shots he was thinking "we got him…I mean how easy…you have a guy layin on the couch…I felt my stress level went down...if he's sleeping we have him."

142. Berg also stated that at the point when Olthoff woke up he felt that the officers "were in control…you know, as far as making the arrest because…what I saw was his hands up…"

143. Neither Cloquet Police Detective Berg nor Officer Cook believed they had deadly force authorization to fire their weapons at Olthoff, resulting in two independent "no shoot" decisions of officers viewing the same facts and circumstances at the precise time Warnygora shot Olthoff.

144. The truthful factual observations and responsive conduct of Detective Berg and Officer Cook are conclusive evidence of objectively reasonable police conduct by officers facing the same "totality of circumstances" as the shooter, Warnygora.

145. At the time that Warnygora shot Olthoff, he was lying on a couch where he had been asleep prior to the use of the flash-bang grenade.

146. By contrast, the officers were in a tactical alignment ready to use force if necessary.

147. Detective Berg knew Warnygora had been the shooter because he saw the spent cartridges and saw Warnygora's second shot with his peripheral vision.

148. Immediately after Warnygora fired twice at Olthoff, Warnygora asked Cloquet Police Detective Berg "who shot?" This was before Warnygora contacted his attorney.

149. To which Detective Berg replied to Warnygora, "You did."

150. A bit later on the porch at the Olthoff trailer, Warnygora again in an excited utterance asked "who shot?" This too was before Warnygora contacted his attorney.

151. Such excited utterances by Warnygora were free of deliberate or conscious misrepresentation.

## WARNYGORA'S FICTITIOUS TALE

152. By July 30, 2019, Warnygora had consulted with his attorney.

153. Warnygora was interviewed by BCA agents in the presence of his attorney at 16:52 hours on July 30, 2019.

154. In this interview, Warnygora first claimed he heard "a pop or a ting" or "some noise that was not a boom."

155. None of the other officers on CERT Team 1, including Detective Berg, Officer Cook or Carlton County Investigator Rusty French claimed to have heard such a noise.

156. Warnygora remembers Officer Cook giving commands to Olthoff about his hands like "put your hands up" or "let me see your hands" which were given.

157. Warnygora claimed to remember hearing "drop it" which no one reported they said.

158. Warnygora went on to tell the BCA that he saw Olthoff's "left hand holding a gun swinging towards himself, Officer Cook and Detective Berg."

159. This assertion by Warnygora is either an outright lie or a psychotic or alcohol-induced delusion.

160. It was not a "reasonable mistake" for Warnygora to claim to perceive Olthoff's empty, open hands this way.

161. This assertion flies in the face of all objective facts, physical and forensic evidence and the consistent statements of the other three occupants of the room, Berg, Cook and Olthoff.

162. Warnygora further went on to claim to the BCA that "he believes he saw the shell extractor and chamber of the side of the gun."

163. This assertion by Warnygora is either an outright lie or a psychotic or alcohol-induced delusion.

164. It was not a "reasonable mistake" for Warnygora to claim to perceive Olthoff's empty, open hands this way.

165. Warnygora went even further to claim to the BCA that this firearm was "semi-automatic handgun black in color and reminded him of a Glock."

166. This assertion by Warnygora is either an outright lie or a psychotic or alcohol-induced delusion.

167. It was not a "reasonable mistake" for Warnygora to claim to perceive Olthoff's empty, open hands this way.

168. Warnygora then told the BCA that after they carried Olthoff to the porch, he went back inside the trailer home and looked on the couch, floor and around but did not see a gun.

169. Despite BCA questioning, none of the other Team 1 members describe or mention this claimed action by Warnygora in their statements to the BCA.

170. Such an action by Warnygora would violate proper crime scene protocol. Obviously, the shooter should be removed immediately from the scene so as to prohibit any opportunity to plant or change crime scene evidence.

171. Warnygora not finding a gun is consistent with all the objective facts, physical and forensic evidence, and the consistent statements of the other three occupants of the room, Berg, Cook and Olthoff.

172. After consulting with his attorney and in the presence of the BCA, Warnygora went on to describe a "thought process" which is a mashup of subjective fears and inkles to attempt to provide some context for claiming to observe things and actions, which by any objective standard, did not exist or happen.

173. Warnygora stated that he subjectively believed "they had guns pointed at them or a gun pointed at them or had been shot at."

174. Such subjective fears are not objectively reasonable given the undeniable facts.

175. Such subjective fears are the common post-attorney-consultation refuge of police officers who improperly use deadly force without any objectively reasonable basis to do so.

176. Former St. Anthony Village Officer Jeronimo Yanez and Minneapolis Police Officer Matthew Harrity and former Minneapolis Police Officer and convicted murderer Mohamed Noor proffered the same type of subjective, deficient excuses in the Philando Castile and Justine Ruszczyk killings.

177. Like those officers, Warnygora told the BCA he was "scared shitless" and was "like holy shit this was happening" without providing any truthful reason for an actual

objectively reasonable fear for his life or the lives of others at the time of his firing his weapon twice.

178. But on July 29, 2019, at 19:00 hours or 2 ½ hours after the shooting without his attorney present, Warnygora asked BCA Special Agent Chad Layon, who was collecting Warnygora's uniform, "if he was recording anything?"

179. BCA Special Agent Layon replied he was not.

180. At that point, Warnygora spontaneously mentioned "that he had consumed two (2) beers earlier that day" "he believed at noon" (1200 hours). Then Warnygora changed the story to "that he may have consumed the beers around 1:00 p.m. (1300 hours). Warnygora then mentioned that he believed that alcohol would be out of his system."

181. July 29, 2019 was a Monday.

182. Before he went drinking on that day, Warnygora was aware that he might be called to go on a CERT raid for Olthoff.

183. It is objectively unreasonable for an officer to become part of such a police action, let alone the lead officer on the entry team, when the officer has consumed alcohol.

184. Warnygora's blood was not drawn at the direction of the BCA until 19:50 hours on July 29, 2019, three hours and twenty minutes after Warnygora shot the unarmed Olthoff twice in his armpit below his raised hands.

185. By contrast, Olthoff's blood was drawn at 17:00 hours that day, 30 minutes after the shooting.

186. Warnygora was not disciplined for drinking alcohol prior to opting in and engaging in a CERT raid.

187. Warnygora was not disciplined for lying to the BCA in his statement.

188. Warnygora was not charged or disciplined for using deadly force on an unarmed man in an objectively unreasonable manner.

189. According to the record, the BCA did not follow up on Warnygora's admission by asking Warnygora where he had consumed those beers on either July 29 or when he gave his formal statement with his attorney on July 30.

190. Nor did the BCA ask Warnygora for receipts or other evidence of his drinking.

191. Nor did the BCA check Warnygora's phone records for his locations prior to the CERT meeting in their investigation.

**<u>THE FAILURE TO DISCIPLINE, THE COVER UP AND RATIFICATION OF WARNYGORA'S CONDUCT</u>**

192. The BCA investigated this officer-involved shooting, and the contents of the BCA file revelations pertinent to Warnygora's use of deadly force are outlined above.

193. The investigating BCA agents, however, followed their agency's normal practice of not confronting law-enforcement witnesses about their patently unreasonable statements or with evidence contradicting their accounts

194. On October 29, 2019, three months after Warnygora shot the unarmed Shawn Olthoff as he was complying with police commands to raise his visibly empty hands, Carlton County, by and through Carlton County Attorney, Lauri A. Ketola, put out a single-page News Release indicating its conclusion that Warnygora's use of deadly force "was necessary, justified and authorized by law."

195. A true and correct copy of that News Release is attached hereto as Exhibit A.

196. There is no mention in that public document that Olthoff was undeniably unarmed.

197. There is no mention in that public document that Olthoff was complying with police commands to put his hands up.

198. There is no mention in that public document that Olthoff was acceding to police authority according to the two Cloquet officers in the same room as Olthoff himself.

199. There is no mention in that public document that there were two other officers who witnessed the same events and give lie to Warnygora's claim.

200. There is no mention in that public document that Cloquet Detective Berg and Officer Cook had made an objectively reasonable "no shoot" decision on the unarmed, compliant Olthoff.

201. There is no mention in that public document that the "no shoot" decision was proper and that this decision was necessary and required by both Minnesota law and the Constitution of the United States.

202. There is no mention in that public document of the fact that Warnygora was drinking alcohol prior to this CERT raid.

203. There is no mention of Warnygora's decision not to decline participation in such a raid within hours of his personal alcohol consumption.

204. There is no mention in that public document that in the immediate and excited aftermath of the shooting of Olthoff, Warnygora asked twice in the presence of two other officers in the room where Olthoff was shot, "Who shot?"

205. There is no mention in that public document that Warnygora's claims of seeing Olthoff with an objectively non-existent gun was a lie or delusion contrived after consultation with his attorney.

206. There is no mention in that public document that Warnygora's poorly claimed subjective beliefs and fears could not be based on the objective facts at the time he discharged his weapon twice at Olthoff.

207. There is no mention in that public document that if an officer can escape justice by subjectively claiming that the unarmed, empty hands of a subject complying with police commands can be filled with an imaginary gun that never existed, there will never be an officer-involved shooting that is either criminal or unconstitutional.

208. Based on the vast amount of evidence against Warnygora, including the unmentioned consistent eyewitness testimony of all the other occupants in the room and all the forensic and physical evidence, Warnygora could and should have been found criminally responsible for rendering a surrendering suspect a quadriplegic.

209. Warnygora's untrue subjective assertions are not enough to create a genuine issue of material fact on his liability under 42 U.S.C. § 1983 for the same acts.

210. In support of Carlton County's non-sensical conclusion, the County prepared a 10-page Case Synopsis, a true and correct copy of which is attached as Exhibit B.

211. The Case Synopsis has all of the fact deficits of the News Release noted in ¶¶ 196 to 207 above.

212. The Case Synopsis fails to note that the officer who made the deadly force decision to shoot, especially when all those similarly situated made "no shoot" decisions, is

allowed to be mistaken, but only if the mistake is objectively reasonable given the circumstances.

213. Warnygora's decision to shoot Olthoff, twice, was not based on an objectively reasonable mistake.

214. Imagining a black semi-automatic pistol, in one of two empty, up-raised hands, of an individual complying with the other officers' commands, can never be an objectively reasonable mistake.

215. Neither Cloquet Detective Berg nor Cloquet Officer Cook were confused or mistaken about the objective facts of Olthoff's empty, up-raised hands or about Olthoff's compliance.

216. The Case Synopsis fails to even mention Berg and Cook's real-time and contemporaneous (not hindsight) independent and consistent accounts of the events transpiring at the time Warnygora shot Olthoff twice in the right armpit.

217. Should the County have admitted the truth, the County would have immediately been exposed to civil liability resulting from Olthoff's undeserved, incomplete quadriplegia.

218. Warnygora was neither disciplined nor charged for any of his conduct, which includes: criminal and unconstitutional use of deadly force; consumption of alcohol shortly before going on a CERT raid; and lying to the BCA in an officer-involved shooting investigation.

219. Carlton County must indemnify Defendant Warnygora under Minn. Stat. § 466.07 for all type, manner and amounts of damages available and 42 U.S.C. § 1983,

including compensatory and punitive damages and costs, including reasonable attorney's fees under 42 U.S.C. § 1988.

## INJURIES AND DAMAGES

220. Olthoff was brought out of the trailer to the porch area.

221. Olthoff was conscious, but did not speak, as the CERT paramedics approached to provide treatment.

222. Upon arrival to the porch, the CERT paramedics observed two gunshot wounds to Olthoff's right chest, underneath his armpit.

223. CERT paramedics began treatment for thoracic gunshot wounds and expedited transport to Mercy Hospital in Moose Lake.

224. Upon arrival to the Emergency Department at Mercy, Olthoff was unresponsive with no heart sounds and no pulse.

225. Olthoff's skin was cool to the touch and he scored a three on the Glasgow Coma Scale.

226. After approximately 5 minutes of CPR, a pulse was regained.

227. The imaging results at Mercy showed two gunshot wounds to Olthoff's upper chest, dense consolidation with his right lung most likely reflecting hemorrhage considering the gunshot injury, small right hemothorax, small right pneumothorax and a generous amount of gas in his stomach.

228. Due to his critical condition, Olthoff was air lifted to Essentia Health – St. Mary's Medical Center in Duluth, Minnesota.

229. At St. Mary's, the emergency room impression of Oltoff, as noted by Dr. Gary Foley, was as follows: "gunshot wound to right chest with T2 spinal cord injury with open burst fracture, traumatic shock and spinal shock, cardiac arrest due to trauma."

230. Imaging confirmed the spinal injury at T2, as well as retropulsion displacement of small fracture segments into the spinal canal, left T2-T3 neural foramen with concerns of spinal cord injury at this level, comminuted fracture of the T4 spinous process and right transverse process, and small bullet segments in the vicinity of the right T4-T5 neural foramen.

231. Olthoff's chest was described as having "[t]wo bullet holes present along the lateral right chest. The upper one is near the axilla, lower is just below the nipple line in the mid axillary line."

232. The below photograph depicts the two bullet wounds described above, which are circled in red. The third opening is from medical intervention for the injuries to Olthoff's right lung.





233. Olthoff has undergone numerous surgeries for the treatment of the injuries he sustained on July 29, 2019, including a C5-T5 fusion.

234. Further, Olthoff underwent multiple surgeries to address a significant wound that formed on the upper portion of his back – a portion of his body not affected by paralysis.

235. Photographs of the C5-T5 fusion, along with imaging depicting the hardware inserted into Olthoff's spine are included below:






H
SITTING
WHEELCHAIR
L
VL


H
R
56"
VL
SITTING




236. A photograph of the painful wound described in Paragraph 234 is included below:



237. Olthoff remained hospitalized until September 17, 2019. During that time, Olthoff oscillated between the hospital, when he required medical treatment, and Miller-Dwan Rehabilitation., where the focus was to optimize his functional independence.

238. During his hospitalization, Olthoff's pain was severe, requiring narcotic pain medication.

239. Warnygora's shots paralyzed Olthoff from the nipples down.

240. Olthoff is not expected to make any meaningful recovery with regard to his paralysis.

241. To-date, Olthoff's medical bills exceed $600,000.

242. Due to his extensive injuries, Olthoff will incur significant future medical expenses.

243. Further, due to his extensive injuries, Olthoff will incur expenses in relation to a life-care plan in an amount in excess of $10,000,000.

244. Below is an excerpt from Olthoff's statement to the BCA, in which he provides a description of his prognosis. In the clip below, "SO" is Olthoff, while "DN" is an agent from the BCA:

DN Um, as far as uh your prognosis and stuff I know Chad's received some medical records but have the doctor's uh advised you what uh what we're looking at

SO Yeah

DN For a prognosis in the future?

SO Paralyzed.

DN Okay

SO From my nipples down

DN Okay

SO They say that I might, maybe possibly gain more feeling but I'll be paralyzed for life.

DN Okay

SO Paralyzed the rest of my life, yeah

DN Okay are, are or do you have uh feeling and stuff to your lower extremities?

SO No just from my nipples down, yeah.

DN Okay and (inaudible)

RB And from the nipples down you don't have feeling.

SO Yeah no feeling from my nipples down.

RB You're, you're in incontinent bowel and, and bladder?

SO Yeah, no I have nothing yeah.

## <u>COUNT ONE</u>

## 42 U.S.C. § 1983 – FOURTH AND FOURTEENTH AMENDMENT VIOLATIONS
*Plaintiff Olthoff v. Defendant Warnygora*

245. Olthoff realleges and incorporates by reference herein each and every allegation contained in each above paragraph as though fully set forth herein.

246. Defendant Warnygora violated Olthoff's Fourth and Fourteenth Amendment rights to be free from the unauthorized and improper use of deadly force by shooting him twice in the chest under his right armpit while he lay prone on a couch with his empty hands in the air.

247. By the actions described above, Defendant Warnygora, under the color of state law, deprived Olthoff of his clearly established and well-settled rights to be free from

the unauthorized and improper use of deadly force under the Fourth and Fourteenth Amendments to the United States Constitution.

248. Defendant Warnygora subjected Olthoff to this deprivation of rights either maliciously or with reckless disregard for whether his rights would be violated.

249. As a direct and proximate result of the acts and omissions of Defendant Warnygora, Olthoff suffered severe and permanent injuries (including paralysis), was forced to endure severe pain and mental suffering, and suffered compensatory damages in an amount in excess of $25,000,000.

250. Punitive damages – here, in excess of $10,000,000 – are available against Defendant Warnygora and are claimed as a matter of right under federal common law and *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

251. Olthoff is entitled to recovery of his costs, including reasonable attorneys' fees under 42 U.S.C. § 1988.

## COUNT TWO

### 42 U.S.C. § 1983 – FAILURE TO TRAIN UNDER *CITY OF CANTON V. HARRIS*
### *Plaintiff Olthoff v. Defendant Carlton Co.*

252. Olthoff reallaeges and incorporates by reference herein each and every allegation contained in each above paragraph as though fully set forth herein.

253. Upon information and belief, before July 29, 2019, Carlton County, with deliberate indifference to the rights of citizens, failed to properly train Defendant Warnygora and failed to properly require and ensure rank and file of the Carlton County Sheriff's Office

adhered to appropriate polices to avoid the unauthorized and improper use of deadly force on citizens.

254. Absent proper training, continued monitoring and discipline of its deputies, including Defendant Warnygora, it is foreseeable that instances of unauthorized and improper use of deadly force will occur.

255. As a direct and proximate result of the acts and omissions by Carlton County, Olthoff suffered severe and permanent injuries (including paralysis), was forced to endure severe pain and mental suffering, and suffered compensatory damages in an amount in excess of $25,000,000.

256. Olthoff is entitled to recovery of his costs, including reasonable attorneys' fees under 42 U.S.C. § 1988.

## COUNT THREE

### 42 U.S.C. § 1983 – *MONELL V. DEP'T OF SOCIAL SERIVCES*
### *Plaintiff Olthoff v. Defendant Carlton Co.*

257. Olthoff reallaeges and incorporates by reference herein each and every allegation contained in each above paragraph as though fully set forth herein.

258. Before July 29, 2019, Carlton County, with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, and promoted a custom, pattern or practice on the part of its deputies, including Defendant Warnygora, of the unauthorized and improper use of deadly force on citizens.

259. As a direct and proximate result of the acts and omissions by Carlton County, Olthoff suffered severe and permanent injuries (including paralysis), was forced to endure

severe pain and mental suffering, and suffered compensatory damages in an amount in excess of $25,000,000.

260. Olthoff is entitled to recovery of his costs, including reasonable attorneys' fees under 42 U.S.C. § 1988.

## COUNT FOUR

**42 U.S.C. § 1983 – FAILURE TO TRAIN UNDER *CITY OF CANTON V. HARRIS***
***Plaintiff Olthoff v. Defendants Carlton Co., City of Moose Lake and City of Cloquet***
**(CERT Agencies)**

261. Olthoff reallaeges and incorporates by reference herein each and every allegation contained in each above paragraph as though fully set forth herein.

262. The Carlton County area CERT was activated on July 29, 2019, with regard to Olthoff.

263. Defendant Warnygora's unauthorized and improper use of deadly force against Olthoff stemmed from that CERT call out.

264. The CERT agencies – Carlton County, City of Moose Lake and City of Cloquet – are liable for the unconstitutional conduct of the team members, including Team Leader and Defendant Warnygora.

265. Upon information and belief, before July 29, 2019, the CERT agencies, with deliberate indifference to the rights of citizens, failed to properly train CERT team members, including Defendant Warnygora, and failed to properly require and ensure the team members' adherence to appropriate polices to avoid the unauthorized and improper use of deadly force on citizens.

266. Absent proper training, continued monitoring and discipline of CERT team members, including Defendant Warnygora, it is foreseeable that instances of unauthorized and improper use of deadly force will occur.

267. As a direct and proximate result of the acts and omissions by the CERT agencies, Olthoff suffered severe and permanent injuries (including paralysis), was forced to endure severe pain and mental suffering, and suffered compensatory damages in an amount in excess of $25,000,000.

268. Olthoff is entitled to recovery of his costs, including reasonable attorneys' fees under 42 U.S.C. § 1988.

## COUNT FIVE

**42 U.S.C. § 1983 – SUPERVISORY LIABILITY**
***Plaintiff Olthoff v. Defendants Carlton Co., City of Moose Lake and City of Cloquet***
**(CERT Agencies)**

269. Olthoff reallaeges and incorporates by reference herein each and every allegation contained in each above paragraph as though fully set forth herein.

270. The Carlton County area CERT was activated on July 29, 2019 with regard to Olthoff.

271. Defendant Warnygora's unauthorized and improper use of deadly force against Olthoff stemmed from that CERT call out.

272. The CERT agencies – Carlton County, City of Moose Lake and City of Cloquet – are liable for the unconstitutional conduct of the team members, including Team Leader Defendant Warnygora.

273. The CERT agencies, with callous or reckless indifference to the rights of citizens, failed to properly supervise, instruct and train the CERT team members, including Defendant Warnygora, with regard to the unauthorized and improper use of deadly force on citizens.

274. Absent proper supervision, instruction and training of CERT team members, including Defendant Warnygora, it is foreseeable that instances of unauthorized and improper use of deadly force will occur.

275. As a direct and proximate result of the acts and omissions by the CERT agencies, Olthoff suffered severe and permanent injuries (including paralysis), was forced to endure severe pain and mental suffering, and suffered compensatory damages in an amount in excess of $25,000,000.

276. Olthoff is entitled to recovery of his costs, including reasonable attorneys' fees under 42 U.S.C. § 1988.

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1. That this Court find that Defendants committed acts and omissions violating the Fourth and Fourteenth Amendments to the United States Constitution, actionable under 42 U.S.C. § 1983;

2. As to Count One, a money judgment against Defendant Jason Warnygora for $25,000,000 in compensatory damages and $10,000,000 in punitive damages, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

3. As to Count Two, a money judgment against Carlton County for $25,000,000 in compensatory damages, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

4. As to Count Three, a money judgment against Carlton County for $25,000,000 in compensatory damages, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

5. As to Count Four, a money judgment against the CERT agencies – Carlton County, the City of Moose Lake, and the City of Cloquet – for $25,000,000 in compensatory damages, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

6. As to Count Five, a money judgment against the CERT agencies – Carlton County, the City of Moose Lake, and the City of Cloquet – for $25,000,000 in compensatory damages, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest; and

7. For such other and further relief as this Court may deem just and equitable.

**ROBINS KAPLAN LLP**

DATED: April 16, 2020

s/Robert Bennett
Robert Bennett, 6713
Andrew J. Noel, 322118
Kathryn H. Bennett, 0392087
Marc E. Betinsky, 0388414
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: 612-349-8500
rbennett@robinskaplan.com
anoel@robinskaplan.com
kbennett@robinskaplan.com
mbetinsky@robinskaplan.com

**ATTORNEYS FOR PLAINTIFF SHAWN MICHAEL OLTHOFF**